**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SHIRLEY J. HOLMES, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-08-2885 |
| | § | |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Shirley Jean Holmes ("Holmes") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. Holmes appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. §§ 416(I), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, the Court is of the opinion that Holmes' Motion for Summary Judgment (Docket Entry No. 16) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) should be granted, and the Commissioner's decision denying benefits should be affirmed.

**I.    _Background_**

On January 13, 2006, Holmes filed applications for disability and SSI benefits with the Social Security Administration ("SSA"), alleging she had been unable to work since December 20, 2003,

due to bipolar disorder,[1] post-traumatic stress disorder,[2] hyperlipidemia,[3] chronic obstructive pulmonary disease ("COPD"),[4] chronic back pain, manic depression,[5] mood disorder,[6] insomnia,[7] anxiety,[8] and auditory and textile hallucinations.  (R. 18, 127-131, 132-137, 143).  After being denied

---

[1]  "Bipolar disorder" refers to mood disorders characterized by a history of manic, mixed, or hypomanic episodes, usually with concurrent or previous history of one or more major depressive episodes, including Bipolar I disorder, Bipolar II disorder, and Cyclothymic disorder.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 528 (29th ed. 2000).

[2]  "Post-traumatic stress disorder" is an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating.  The onset of symptoms may be delayed for months to years after the event.  *See* DORLAND'S, *supra*, at 531.

[3]  "Hyperlipidemia" is a general term for elevated concentrations of any or all of the lipids in the plasma, including hypertriglyceridemia, hypercholesterolemia, etc.  *See* DORLAND'S, *supra*, at 852.

[4]  "Chronic obstructive pulmonary disease" ("COPD") is a disorder characterized by persistent or recurring obstruction of bronchial air flow, such as chronic bronchitis, asthma, or pulmonary emphysema.  *See* DORLAND'S, *supra*, at 513.

[5]  "Depression" refers to a mental state of depressed mood characterized by feelings of sadness, despair, and discouragement.  Depression ranges from normal feelings of "the blues"' through dysthymic disorder to major depressive disorder.  It in many ways resembles the grief and mourning that follow bereavement; there are often feelings of low self-esteem, guilt, and self-reproach, withdrawal from interpersonal contact, and somatic symptoms such as eating and sleep disturbances.  *See* DORLAND'S, *supra,* at 477.

[6]  "Mood disorders" generally refers to mental disorders whose essential feature is a disturbance of mood manifested as one or more episodes of mania, hypomania, depression, or some combination.  Functional mood disorders are subclassified as *bipolar disorders*, including bipolar I disorder, bipolar II disorder, and cyclothymic disorder; *depressive disorders*, including major depressive disorder and dysthymic disorder; *mood disorder due to a general medical condition*; and *substance-induced mood disorder*.  *See* DORLAND'S, *supra*, at 530.

[7]  "Insomnia" is the inability to sleep.  *See* DORLAND'S, *supra*, at 903.

[8]  "Anxiety" is an unpleasant emotional state that is caused by the anticipation of unreal or imagined danger. Symptoms include increased heart rate, altered respiration rate, sweating, trembling, weakness and fatigue. It may also include feelings of impending danger, powerlessness, apprehension and tension.  *See* DORLAND'S, *supra*, at 109

benefits initially on March 28, 2006, and upon reconsideration on July 14, 2006, Holmes requested an administrative hearing before an ALJ.  (R. 18, 61-64, 65-71, 75-79, 80-86).

A hearing was held on September 4, 2007, in Houston, Texas, at which time the ALJ heard testimony from Holmes and Kay S. Gilreath, a vocational expert ("VE").  (R. 28-60).  In a decision dated October 25, 2007, the ALJ denied Holmes' applications for benefits.  (R. 18-27).  On December 21, 2007, Holmes appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 11-14).  On July 25, 2008, the Appeals Council denied Holmes' request to review the ALJ's determination.  (R. 1-3).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Holmes filed this case on September 25, 2008, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

## II.   *Analysis*

### A.   *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, February 2006, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Holmes has acquired sufficient quarters of coverage to remain insured through December 31, 2008.  (R. 18).  Thus, Holmes must establish disability on or before that date in order to be entitled to benefits.

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

**B.**     ***Standard of Review***

**1.**     ***Summary Judgment***

_____The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n*

5

*of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.     *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id.*

### C.     *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the

Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a),(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since December 20, 2003, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following impairments: bipolar disorder and post traumatic stress disorder (PTSD) (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she is unable to perform highly detailed work requiring sustained concentration, attention, persistence or pace for prolonged periods.  She is further limited to only occasional interaction with the general public or co-workers.

6.    The claimant is capable of performing her past relevant work as a hotel housekeeper.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from December 20, 2003 through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 20, 23-24, 26).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether

the decision to deny Holmes' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; as well as, (4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

###   D.    *Issues Presented*

_____Holmes contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Holmes claims that the ALJ erred by:  (1) failing to obtain an updated medical opinion of a medical expert as to the medical equivalence; (2) failing to properly develop the case by not obtaining an updated medical expert opinion; (3) failing to give controlling weight to the opinion of Holmes' treating physician; (4) failing to find that Holmes met or equaled Listing 12.04, 12.06, or 12.08; and, (5) failing to find Holmes' hyperlipidemia, COPD, chronic back pain, manic depression, mood disorder, insomnia, anxiety, and auditory and textile hallucinations to be "severe" impairments.  *See* Docket Entry Nos. 16, 19.   The Commissioner disagrees with Holmes' contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry Nos. 17, 18.

E.     *Review of the ALJ's Decision*

    1.     *Objective Medical Evidence and Opinions of Physicians*

      When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry.  *See id*. at 532; *see also* 20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The ALJ must address the degree of impairment caused by the combination of physical and mental medical problems.  *See Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (citations omitted).  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.* (emphasis in original).  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *Id.* at 531 (emphasis in original) (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

(1)(I)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A)   You do not exhibit one or more of the medical findings specified in the particular listing, or

(B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

*See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R.  §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Holmes' administrative hearing reveals that Holmes was molested as a child by an older brother, has had a variety of psychological issues, has undergone back surgery at L4-5, and has smoked a pack of cigarettes a day for over twenty years.  (R. 254).

On March 13, 2006, Holmes visited a psychologist, J. L. Paterson, Ph.D. ("Dr. Paterson"), for a clinical interview and a mental status examination at the request of the Disability Determination Division. (R. 199-202).  Holmes alleged that she suffers from bipolar disorder and manic depression. (R. 199).  Dr. Paterson noted that Holmes arrived early for the scheduled examination and had used public transportation.  (R. 199).  He observed Holmes' gait and gross motor movements as fluid and well coordinated, and noted that she had good eye contact.  (R. 199).  It was reported that Holmes had completed through 8th grade, and that she could verbally express herself in English.  (R. 199). Holmes reported that she had not seen a doctor "in a long time" and that she was not taking any medication at that time due to lack of funds.  (R. 200).

Dr. Paterson's assessment of the claimant's daily activities indicated that Holmes was able to care for her personal needs, including bathing, dressing, caring for her residence, and preparing food.  (R. 200).  Dr. Paterson noted, however, that Holmes had long-standing difficulty with stress management and was easily upset by minor stressors. Dr. Paterson's assessment further indicated

that Holmes' memory and concentration were intact.  (R. 201).  Moreover, Holmes was able to

compute simple change in her head.  (R. 201).  Holmes' intellectual functioning was considered

"average" based on Dr. Paterson's mental status examination.  (R. 201).  Following the assessment,

Dr. Paterson diagnosed Holmes with bipolar disorder, PTSD, and assigned Holmes a Global

Assessment of Functioning ("GAF") score of 60.[9]  (R. 202).  Dr. Paterson referred Holmes to Ben

Taub to obtain medication refills.  (R. 216)

On March 13, 2006, Holmes visited the emergency room at the Harris County Hospital

District, complaining that she had experienced difficulty sleeping for the past three days, that she had

been "off her meds" for months since moving to Houston, and cannot sit still.  (R. 213).  Holmes'

mood was noted as upset and her affect was tearful.  (R. 213).  At that time, it was reported that

Holmes was homeless.  (R. 214-215).  Although Holmes had reportedly denied drug use, her urine

drug screen tested positive for PCP.  (R. 213-214, 217).  Holmes was diagnosed with a mood

disorder.  (R. 211, 214).  Holmes' GAF was rated at 55.[10]  (R. 215).  It was noted that there was no

bipolar disorder and no major depressive disorder.  (R. 214).  Holmes was discharged and referred

to Ben Taub Psychiatry Clinic for an evaluation.  (R. 212, 214).

---

[9]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See*
AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS
("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale,
which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent
danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular
decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores
signify more serious symptoms. A GAF rating of 60 indicates " moderate symptoms" (*e.g.*, flat affect and
circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school
functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See* DSM-IV-TR, *supra*, at 34.

[10]  A GAF rating of 55 indicates a " moderate symptoms" (*e.g.*, flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few
friends, conflicts with peers or co-workers).  *See* DSM-IV-TR, *supra*, at 34.

14

On March 20, 2006, Jim Cox, Ph.D. ("Dr. Cox"), completed a mental residual functional capacity assessment of Holmes.  (R. 203-206).  According to Dr. Cox, in the majority of mental activities (*i.e.*, 13 of 20), Holmes was "not significantly limited."  (R. 203-204).  In the remaining seven mental activities, Dr. Cox found Holmes "moderately limited."  (R. 203-204).  Those activities included: (1) the ability to understand and remember detailed  instructions; (2) the ability to carry out detailed instructions; (3) the ability to  maintain attention and concentration for extended periods; (4) the ability to work in coordination with or proximity to others without being distracted by them; (5) the ability to complete a normal workday and workweek without interruptions from psychologically based symptom and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) the ability to interact appropriately with the general public; and (7) the ability to accept instructions and respond appropriately to criticism from supervisors.  (R. 203-204).  Dr. Cox's assessment was that Holmes could understand, remember, and carry out detailed, but not complex, instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine work setting.  (R. 205).

On March 20, 2006, Dr. Cox also completed a psychiatric review technique form, reviewing listings 12.04 Affective Disorders and 12.06 Anxiety Related Disorders. (R. 185-198).  With respect to the listings, Dr. Cox noted that Holmes had a medically determinable impairments of bipolar disorder, mixed, severe without psychosis, and PTSD, but they did not precisely satisfy the diagnostic criteria of listing 12.04 or 12.06, respectively.  (R. 188, 190).  Dr. Cox reported Holmes degree of functional limitation in the areas of "restriction of activities of daily living" and "episodes of decompensation, each of extended duration," as "none."  (R. 195).  Dr. Cox noted Holmes had a "mild" functional limitation in the area of "difficulties in maintaining concentration, persistence,

or pace." (R. 195).  In the area of "difficulties in maintaining social functioning, Dr. Cox determined

that Holmes had a "moderate" functional limitation.  (R. 195).  Dr. Cox reported that Holmes did

not establish the "C" criteria of the listings.  (R. 196).  Dr. Cox concluded that Holmes' allegations

caused by her symptoms were not fully supported by the evidence of record.  (R. 197).

On April 7, 2006, Holmes visited the psychiatry clinic at Harris County Hospital District.

(R. 210).  Holmes self-reported a history of bipolar disorder and PTSD.  (R. 210).  Progress notes

indicated that Holmes had been off her medication for several months.  (R. 210).

On May 12, 2006, Holmes visited Patrick D. Dwyer, M.D. ("Dr. Dwyer") at the Casa de

Amigos Clinic, seeking medication refills.  (R. 219).  Holmes reported that she had been out of her

medication since 2002.  (R. 219).  Holmes had follow-up appointments at the Clinic on June 23,

2006, September 29, 2006, and October 24, 2006.   (R. 219-220, 225).   Progress notes from

September 29, 2006, indicated that Holmes had hyperlipidemia and COPD. (R. 221, 225).  A chest

x-ray, however, taken on September 29, 2006, was normal.  (R. 235).  Holmes' lungs were noted as

clear and Dr. Dwyer's impression was "cough." (R. 235, 251). On November 21, 2006, Holmes had

a toxicology screen that was negative for drug use. (R. 249).

On December 7, 2006, Holmes visited a psychiatrist, Liliana Z. Miranda, M.D. ("Dr.

Miranda"), at the Casa de Amigos Clinic, for a comprehensive psychiatric assessment.  (R. 252-259).

Dr. Miranda diagnosed Holmes with PTSD, Bipolar 2 Disorder, and Psychosis. (R. 252).  During

the consultation, Holmes complained of paranoia, sleeplessness, and depression. (R. 254).  Holmes

alleged that she preferred be to alone and remain at home in bed.  (R. 254).   Holmes further

recounted her prior molestation as a child, as well as poor family history.  (R. 255).  Dr. Miranda

recommended routine counseling to help address issues related to the molestation, a mood stabilizing medication for the bipolar disorder, and an antipsychotic medication for her psychosis. (R. 255).

On December 28, 2006, Holmes visited Dr. Miranda for a follow-up examination for her depression and psychosis. (R. 262). Holmes reported to Dr. Miranda that she felt and slept better, aside from the Christmas holiday, and that her auditory (but not visual) hallucinations had ceased. (R. 262). Dr. Miranda noted that Holmes' attitude was cooperative; however, Holmes' affect was anxious, her mood was depressed, and she displayed mild agitation. (R. 262). At that time, Holmes denied experiencing side effects from her medication. (R. 262). Progress notes revealed that Holmes' "pain score" was rated at "0." (R. 263-264). Dr. Miranda diagnosed the claimant with PTSD, Bipolar disorder, chronic back pain, and a GAF score of 55. (R. 262).

On February 8, 2007, Holmes visited Dr. Miranda for a follow-up appointment. (R. 276-281). At this appointment, Holmes indicated her mood was "all right," that she slept better, and that the voices were becoming less frequent. (R. 278). Dr. Miranda made a similar diagnosis of PTSD, bipolar disorder, and rated Holmes' GAF score at 55. (R. 278). On February 15, 2007, Holmes visited Dr. Dwyer, complaining of continuous back pain. (R. 286). Holmes rated her pain as an "8." (R. 289-290). Dr. Dwyer noted a normal examination of Holmes' extremities, and that there was no clubbing, cyanosis, or edema. (R. 286).

On May 3, 2007, Dr. Miranda completed a mental impairment questionnaire regarding Holmes' functional capacity. (R. 265-271). Dr. Miranda diagnosed Holmes with bipolar disorder, PTSD, and a GAF score of 50.[11] (R. 265). Dr. Miranda noted that Holmes had mood swings, suffers

---

[11] A GAF rating of 50 indicates "serious symptoms" (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *See* DSM-IV-TR, *supra*, at 34.

17

from poor sleep, extreme anxiety, and poor concentration.  (R. 265).  According to Dr. Miranda, Holmes' prognosis was "fair."  (R. 265).  Dr. Miranda further noted that Holmes suffered from a pervasive loss of interest in almost all activities; appetite disturbances and weight change; difficulty thinking or concentrating; emotional withdrawal: hallucinations or delusions and 6) a persistent irrational fear of a specific object which results in a compelling desire to avoid the dreaded object, activity or situation.  (R. 266).

Dr. Miranda noted that the claimant was seriously limited, but not precluded, in several areas of mental abilities.  (R. 267-268).  As far as functional limitations, Dr. Miranda opined that Holmes had "none or mild" restriction of activities of daily living and "marked" restrictions in the areas of "difficulties in maintaining social functioning," "deficiencies of concentration, persistence or pace," and repeated episodes of decompensation within 12 month period, each of at least two weeks duration."  (R. 269).  Dr. Miranda noted that Holmes' mental impairments would cause her to be absent from work "about four days per month."  (R. 270).

## 2. *Step Two of the Sequential Evaluation Process*

Holmes contends that the ALJ erred at step two of the sequential evaluation process by not finding her alleged hyperlipidemia, COPD, chronic back pain, manic depression, mood disorder, insomnia, anxiety, and auditory and textile hallucinations to be "severe" impairments.  Holmes' argument is misplaced.  As a threshold matter, the ALJ did not decide this case at step two— *i.e.*, the issue of severity.  *See Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987) (noting that the improper application of *Stone* standard irrelevant to the disposition of case if outcome does not turn on issue of severity).  Furthermore, Holmes did not even report most of her allegedly severe impairments at the time she filed her applications.  Indeed, the only impairments she mentioned were

18

manic depression and bipolar disorder.  (R. 143).  Even Holmes' counsel acknowledged at the hearing that this case deals mostly with a mental impairment.  (R. 33).

Nevertheless, contrary to Holmes' contention, the ALJ thoroughly evaluated Holmes' functional limitations allegedly imposed by her allegedly severe impairments, and found that they did not cause any work limitations.   Although in September 2006, Holmes was diagnosed with hyperlipidemia, COPD, and other conditions, the mere diagnoses without resulting significant functional restrictions is not disabling.  *See Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir. 1984). Although Holmes testified that if she is around smoke a lot, it can trigger a COPD attack, Holmes reportedly smoked a pack of cigarettes a day for the past twenty years.  (R. 228).  It is within the ALJ's discretion to discount Holmes' subjective complaints based on, among other things, his decision to not follow physicians' recommendations.  *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).  Notwithstanding Holmes' failure to cease smoking, an October 3, 2006, chest x-ray indicated that her lungs were clear.  (R. 251).

Moreover, Holmes testified at the administrative hearing that her medications alleviated her back pain, COPD and bipolar disorder. (R. 40, 43, 45).  Holmes testified that she generally took only over-the-counter medications (*e.g.*, Advil or Acetaminophen) for the pain.  (R. 255, 258, 341).  The Fifth Circuit has consistently held that where treatment would remedy an impairment and an individual fails to follow prescribed treatment without good cause, the ALJ may properly find the individual not disabled.  *See Johnson v. Sullivan*, 894 F.2d 683, 685 n.4 (5th Cir. 1990). Furthermore, as pointed out by the ALJ, there is no objective medical evidence (*e.g.*, x-rays, MRI's) to corroborate Holmes' complaints of back pain.  Similarly, there was no limitation in

the range of motion or other neurological deficits noted in the evidence of record. In fact, treatment notes indicated no physical limitations. (R. 286).

Taking into consideration the above, substantial evidence supports the ALJ finding that there was no objective medical evidence consistent with Holmes' allegedly "severe" additional impairments.

### 3. *Medical Expert Testimony*

Holmes contends that the ALJ erred by not consulting a medical expert regarding Holmes' residual functional capacity ("RFC"). The Commissioner correctly points out that the issue of RFC is a factual determination reserved to the Commissioner. *See Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). The decision to consult with a medical expert is within the discretion of the ALJ. *See Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989). Here, there is ample evidence to support the ALJ's finding of no medical equivalency, including assessments made by the state agency doctors. (R. 61, 63). A state agency, non-examining physician can make these equivalency determinations on the record alone, without a personal examination. *See, e.g.*, *Ransom v. Heckler*, 715 F.2d 989, 993-994 (5th Cir. 1983). Here, the ALJ properly reviewed the evidence of record and exercised his discretion to not call for medical expert testimony.

### 4. *Discounting Opinion of Treating Physician*

Holmes argues that the ALJ erred in discounting the mental impairment questionnaire completed by her treating physician, Dr. Miranda. (R. 22, 265-271). An ALJ is free to discount the opinion of a physician when the evidence supports a contrary conclusion. *See Martinez*, 64 F.3d at 176. Here, the ALJ had good cause to give less weight to the opinion of Dr. Miranda because her opinion was not based on acceptable clinical and laboratory diagnostic techniques. In fact, Dr.

20

Miranda's report appears to be based, primarily, on Holmes' subjective complaints.  The evidence of record indicated that Holmes had visited Dr. Miranda only three times as of the date of the report: December 2006, February 2007, and May 2007.  (R. 22, 254, 259-261, 276-278).  A treating physician's recording of symptoms is not entitled to great weight when the documentation of symptoms was "by history," rather than by direct observation.  *See Greenspan*, 38 F.3d at 237-38.

Additionally, the ALJ properly rejected Dr. Miranda's opinion, in part, due to inconsistent information in her May 3, 2007, mental impairment questionnaire.  (R. 22, 265-271).  As set forth by the Commissioner, the report denotes an inability for Holmes to deal with normal work stresses and that Holmes would have serious limitations; however, Dr. Miranda also noted that Holmes would not be precluded from dealing with the stress of semi-skilled and skilled work.  (R. 268).  Likewise, Dr. Miranda characterized Holmes as disabled because she had "marked" functional limitations in maintaining social functioning, and deficiencies of concentration, persistence or pace.  (R. 269).  Despite these alleged "marked" limitations, Dr. Miranda found that Holmes would be able to manage her benefits.  (R. 271).  Further, only one month after completing the mental impairment questionnaire, Dr. Miranda reported that Holmes was sleeping better and had experienced less mood swings with the medications.  (R. 325-326).

Moreover, Dr. Miranda's opinion regarding Holmes' RFC was more limiting than that of Dr. Paterson.  (R. 199-202, 265-271).  Dr. Paterson noted that Holmes' thought content included no report of delusions or hallucinations, though she had flashbacks of childhood abuse.  (R. 201).  Dr. Paterson also opined that if benefits were assigned that Holmes should be able to manage her funds.  (R. 202).  Dr. Paterson rated Holmes' GAF at 60, indicating mild symptoms.  (R. 202).  All of

Holmes' GAF ratings were scored as moderate (including other ratings by Dr. Miranda) except for the GAF rating in Dr. Miranda's medical impairment questionnaire.  (R. 215, 262, 265, 278). Although GAF scores are not determiners of an ability to work, the ALJ properly considered the scores along with the rest of the medical evidence in reaching his determination that Holmes could perform her past relevant work as a hotel housekeeper.  *See Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *Stalvey v. Apfel*, 242 F.3d 390, 2001 WL 50747, at *2 (10th Cir. Aug. 18, 1999).

Dr. Miranda's opinion regarding Holmes' RFC also was more limiting than that of Dr. Cox. (R. 203, 205, 265-271).  Dr. Cox found that Holmes did not experience any marked limitations. (R. 203).  According to Dr. Cox, Holmes could understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting.  (R. 205).

In sum, the ALJ correctly found that Holmes had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: Holmes is unable to perform highly detailed work or work requiring sustained concentration, attention, persistence, or pace for prolonged periods. (R. 24).  These non-exertional limitations were supported by the medical evidence of record and were consistent with her past relevant work as a hotel housekeeper.  (R. 26). Consequently, substantial evidence supports the ALJ's decision

III.    *Conclusion*

Accordingly, it is therefore

**ORDERED** that Holmes' Motion for Summary Judgment (Docket Entry No. 16) is **DENIED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision denying disability benefits is **AFFIRMED**. Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this the 30th day of September, 2009.


Calvin Botley
United States Magistrate Judge

23